# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

---

TOWAUN COLEMAN,

                           Plaintiff,

                                               9:15-CV-40 (ATB)

     v.

LUKE NOLAN,

                           Defendant.

---

MICHAEL E. KOLB, ESQ., for Plaintiff
ERIK BOULE PINSONNAULT, Asst. Attorney General, for Defendant Nolan

ANDREW T. BAXTER
United States Magistrate Judge

## DECISION AND ORDER

       Plaintiff Towaun Coleman filed this action pursuant to 42 U.S.C. § 1983, alleging that, while an inmate at the Clinton Correctional Facility ("Clinton"), he was deprived of his civil rights by various individuals employed by the New York State Department of Corrections and Community Supervision ("DOCCS"). (Compl., Dkt. No. 1; Am. Compl., Dkt. No. 19). As a result of an initial review of plaintiff's amended complaint and litigation of a defense motion to dismiss before Senior District Judge Thomas McAvoy, the only surviving cause of action arises from plaintiff's allegation that, on December 4, 2014, defendant Correction Officer Luke Nolan used excessive force against plaintiff by striking him in the leg with a baton while plaintiff was asleep in his cell. (*See* 6/24/2015 Decision and Order, Dkt. No. 21; 1/4/2016 Decision and Order, Dkt. No. 38).

       Defendant Nolan subsequently moved for summary judgment based on plaintiff's

alleged failure to exhaust his administrative remedies. (Dkt. No. 50). Adopting my Report-Recommendation (Dkt. No. 53), Judge McAvoy denied summary judgment, finding that there was a material issue of fact as to whether the administrative grievance process was "unavailable" to plaintiff under the particular circumstances of this case. (6/14/2017 Decision and Order, Dkt. No. 57). *See Ross v. Blake*, __ U.S. __, 136 S. Ct. 1850, 1858-60 (2016). On January 24, 2018, Judge McAvoy appointed counsel to assist the formerly pro se plaintiff at a trial on his excessive force claim, which was scheduled to begin on September 17, 2018. (1/24/2018 Order, Dkt. No. 63; Amended Pretrial Scheduling Order, Dkt. No. 64).

On April 20, 2018, defense counsel requested an evidentiary hearing and judicial ruling on the issue of whether plaintiff exhausted his administrative remedies, pursuant to *Messa v. Goord*, 652 F.3d 305, 308-10 (2d Cir. 2011). (Dkt. No. 67). Judge McAvoy referred that motion to me to issue a Report-Recommendation. (Dkt. No. 68). On May 14, 2018, Judge McAvoy re-assigned the case to me for all further proceedings, including the entry of judgment, with the consent of the parties. (*See* Dkt. Nos. 75, 76). The parties filed various pre-hearing submissions with respect to exhaustion issues. (Dkt. Nos. 71, 72, 78-81).

At a conference prior to the "exhaustion hearing," defense counsel stipulated that a grievance process was in place at Clinton while plaintiff was confined there, and that DOCCS has no record that plaintiff filed a grievance or grievance appeal relating to defendant Nolan's alleged use of excessive force on December 4, 2014. (*See* 6/14/2018 Text Minute Entry). Plaintiff contends, however, that he made two unsuccessful

attempts to file a grievance pursuant to DOCCS procedures, and that, under the circumstances of this case, the grievance process was "unavailable" to him, within the meaning of *Ross*. (*See* 6/8/2018 Ltr. of Pl.'s Counsel, Dkt. No. 79).

I conducted the requested evidentiary exhaustion hearing on June 27, 2018, during which plaintiff and several DOCCS witnesses testified. (6/27/19 Transcript ("Tr."), Dkt. No. 88). Inmate Donnell Jefferson was designated as a witness for plaintiff, and was expected to testify that he placed plaintiff's first grievance in the facility mail box, at the request of plaintiff, who was then confined to his cell on "keeplock" status. However, inmate Jefferson did not testify at the hearing because he refused to come out of his cell pursuant to the writ issued by this court to secure his appearance, apparently because he was not clear on where he was going to be transported or why. (Tr. at 2, 5-6, 202-03; 6/26/18 & 7/13/2018 Text Minute Entries). For the first time, during the exhaustion hearing, defense counsel suggested that this action should be dismissed because plaintiff first filed the action before his opportunity to exhaust his administrative remedies was extinguished. (Tr. at 100-03, 192-94, 202). *See Neal v. Goord*, 267 F.3d 116, 122 (2d Cir. 2001) (subsequent exhaustion after suit is filed is insufficient), *overruled on other grounds, Porter v. Nussle*, 534 U.S. 516 (2002).

The court subsequently ordered that the parties depose inmate Jefferson with respect to, inter alia, any information relevant to exhaustion issues. (7/13/2018 Text Minute Entry). The deposition was not conducted until September 14, 2018. At the court's direction, the parties submitted post-hearing briefing, the last of which was

3

submitted on October 1st, after the Jefferson deposition. (Dkt. Nos. 87, 95, 96).

Based upon the evidence adduced at that hearing and thereafter, and the law outlined below and in my prior Report-Recommendation (Dkt. No. 53), I conclude that plaintiff presented credible evidence that the grievance process was unavailable to him in connection with his complaint of excessive force. Because the grievance process was "unavailable" to plaintiff by the time he filed this action, I reject defendant's argument that this lawsuit should be dismissed because it was filed prematurely. I find, further, that defendant has failed to sustain his burden to prove, by a preponderance of the evidence, the affirmative defense that plaintiff failed to exhaust his administrative remedies. Accordingly, this case must proceed to trial on plaintiff's surviving cause of action for excessive force.

## I. Exhaustion of Administrative Remedies

### A. General Legal Standards

The Prison Litigation Reform Act, ("PLRA"), 42 U.S.C. §1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the

defendants. *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g., Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones*, 549 U.S. at 218-19 (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)). In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90-103.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id*. § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC"). *Id*. § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program ("IGP") encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility). There is also an expedited procedure for complaints raising bona fide issues of harassment by staff, which

5

bypasses the IGRC, and initially refers the grievance to the facility superintendent or his designee for prompt review, investigation, and decision. *Id*. § 701.8.

Until recently, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies. *See Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir. 2004). The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

However, the Supreme Court has now made clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." *Ross v. Blake*, 136 S. Ct. at 1857. "'[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.'" *Riles v. Buchanan*, No. 15-3336-pr, 2016 WL 4572321, at *2 (2d Cir. Sept. 1, 2016) (quoting *Ross*, __ U.S. at __, 136 S. Ct. at 1857). Although *Ross* did away with the "special circumstances" exception, the other two factors in *Hemphill*–availability and estoppel–are still valid. The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability. *Ross*, __ U.S. at __, 136 S. Ct. at 1858. Courts evaluating whether an inmate has exhausted his or her administrative remedies must focus on whether those remedies were "available" to the inmate. *Id.; see also Riles*, 2016 WL 4572321 at *2. An administrative procedure is "unavailable" when

> (1) "it operates a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates; (2) it is "so opaque that is [sic] becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."

*Riles, supra* (quoting *Ross*, __ U.S. at __, 136 S. Ct. at 1859-60).

In *Ross*, the Supreme Court gave examples of the circumstances under which each of the above would apply. *Ross*, __ U.S. at __, 136 S. Ct. at 1859-60. The first circumstance listed above involves a case in which the relevant "administrative procedure" lacks the authority to provide "any" relief. *Id.* at 1859. The second example is when the administrative procedure "exists," but is so complicated or "opaque" that no ordinary prisoner could "discern or navigate it." *Id.* Finally, administrative remedies are not available if prison administrators prevent inmates from taking advantage of the grievance process by misleading or threatening them, preventing their use of the administrative procedure. *Id.* at 1860.

In *Williams v. Priatno*, 829 F.3d 118, 123-27 (2d Cir. 2016), the Second Circuit considered whether administrative remedies had been "actually available" to the plaintiff under *Ross*, after the district court granted the defendants' motion to dismiss for failure to exhaust. The plaintiff alleged that, while housed in the special housing unit ("SHU"), he drafted a grievance that he delivered to a correction officer to forward to the grievance office on his behalf. *Id*. at 120-121. Approximately two weeks later, the plaintiff was transferred to a different facility. *Id*. at 121. He never received a response to his grievance and alleged that it was never filed by the officer to whom he

had given it. It was undisputed that plaintiff never appealed the grievance. *Id*.

The defendants in *Williams* argued that even if the grievance was never filed, the plaintiff was required to appeal it and complete the grievance process. *Id*. at 124. The defendants relied on a DOCCS regulation that provided that "an inmate may appeal a grievance 'to the next step' if he does not receive a timely response." *Id*. (quoting N.Y. Comp. Codes R. & Regs. tit. 7, § 701.6(g)(2)). The Second Circuit rejected this argument and held that, for an inmate in the plaintiff's situation, the regulatory scheme was so "opaque" and "confusing" as to be practically unavailable. *Id*. The Second Circuit found that DOCCS regulations "only contemplate appeals of grievances that [have been] actually filed . . . [and] give no guidance whatsoever to an inmate whose grievance was never filed." *Id*. Thus, *Williams* holds that "the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it." *Id*. at 126.[1] *See also Medina v. Napoli*, 725 F. App'x 51, 53-54 (2d Cir. 2018) (following *Williams* in the context of a summary judgment motion).

## B. Exhaustion Hearings

The Second Circuit has ruled that a plaintiff in a lawsuit governed by PLRA is not entitled to a jury trial relating to his exhaustion of administrative remedies. *Messa v. Goord*, 652 F.3d at 308-10. Rather, PLRA exhaustion is a matter of judicial administration, and the court, not a jury, determines factual disputes regarding an inmate's alleged failure to exhaust. *Id*. at 308-08.

---

[1] My summary of *Williams* tracks that of Magistrate Judge Stewart in *Berman v. Durkin*, No. 9:13-CV-136 (LEK/DJS), 2017 WL 1215814, at *8 (N.D.N.Y. Mar. 10, 2017), (Rep't-Rec.), *adopted*, 2017 WL 1207834 (N.D.N.Y. Mar. 31, 2017).

As noted above, the defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action. *See, e.g., Howard v. Goord*, No. 98-CV-7471, 1999 WL 1288679, at *3 (E.D.N.Y. Dec. 28, 1999). However, once a defendant has produced reliable evidence that such remedies were generally available, and the plaintiff nevertheless failed to exhaust those remedies, the plaintiff must then counter the defendant's proof by showing that, as to him or her, the remedy was unavailable. *Smith v. Kelly*, 985 F. Supp. 2d 275, 284 (N.D.N.Y. 2013) (Suddaby, J.). "As a result, practically speaking, while the burden on this affirmative defense remains at all times on the defendant, the plaintiff may sometimes have to adduce evidence in order to defeat it." *Id*. While there is some ambiguity in the district court cases in the Second Circuit on this point, I agree with Magistrate Judge Peeble's cogent analysis that, while "the burden of production" may shift to a plaintiff when a court considers whether the grievance process was unavailable, "the ultimate burden of proof with respect to the exhaustion defense remains, at all times, with the defendant." *See, e.g.*, *Bailey v. Fortier*, No. 9:09-CV-0742 (GLS/DEP), 2012 WL 6935254, at *5-6 (N.D.N.Y. Oct. 4, 2012) (Rep't-Rec.), *adopted*, 2013 WL 310306 (N.D.N.Y. Jan. 25, 2013); *Nelson v. Plumley*, No. 9:12-CV-422 (TJM/DEP), 2015 WL 4326762, at *7-8 (N.D.N.Y. July 14, 2015) (Rep't-Rec.), *adopted*, 2013 WL 1305338 (N.D.N.Y. Mar. 18, 2013).[2]

---

[2] *Smith v. Kelly*, *Bailey*, and *Nelson* were all decided before *Ross*, and applied the *Hemphill* factors. However, given that "unavailability" is a common and critical element of the legals standards stated in both in the *Hemphill* line of cases and in *Ross*, the reasoning of the earlier cases with respect to the burden of production and the ultimate burden of proof remain sound after *Ross*.

9

## II.    Facts

### A.    Undisputed Facts

As noted, plaintiff stipulated that a grievance process was in place at DOCCS and at Clinton during the relevant time period, and that neither had a record of plaintiff filing a grievance or grievance appeal relating to the alleged December 4, 2014 assault. (Tr. at 12).  Plaintiff acknowledged this during his hearing testimony (Tr. at 51-52), and the defendant briefly offered proof supporting the stipulation at the exhaustion hearing (Tr. at 111-113, 125-30).  The parties also stipulated to the admission of Defendant's Exhibits 1 through 25 and Plaintiff's Exhibits A through I (subject to relevance objections), although Plaintiff's Exhibit D was admitted for a limited purpose.  (Tr. 9-11, 17, 18, 45, 122, 191).

### B.    Plaintiff's Version of Disputed Facts

Plaintiff testified during the exhaustion hearing, referencing various defense exhibits and offering several additional plaintiff's exhibits.  He stated that, during the evening of December 4, 2014, he wrote a grievance complaining of defendant Nolan's use of excessive force on plaintiff earlier that afternoon.  (Tr. at 19, 74).  Plaintiff made and retained a carbon copy of the grievance, a photocopy of which he identified, and which was admitted as Defendant's Exhibit 11.  (Tr. at 73).  The grievance alleged that plaintiff was asleep in his cell when he felt a sharp pain in his lower right leg, and then awoke to see a correction officer, who he later learned was defendant Nolan, putting away his baton.  (Def.'s Ex. 11).  When plaintiff stated that he was going to report the incident, defendant Nolan stated, *inter alia*, "write whatever the fuck you want, you see

10

what writing just got you." (*Id.*; Tr. at 46, 74-75).

Defendant Nolan issued plaintiff a misbehavior report as a result of their interaction on December 4th, alleging that plaintiff interfered with Officer Nolan's inmate count and disobeyed a direct order. (Tr. at 46-48; Pl.'s Ex. G). Starting on the morning of December 5th, plaintiff was confined in his cell on "keeplock" status pending resolution of the disciplinary charges against him. (Tr. at 47). Plaintiff had placed the grievance in an envelope, which was addressed to the grievance unit and which had plaintiff's name on it. (Tr. at 19-20). Because he was restricted to his cell, plaintiff passed the envelope containing the grievance to an inmate in an adjacent cell, named Jefferson, to put in the facility mailbox that morning.[3] (Tr. at 19, 20-21, 76). In response to cross-examination by defense counsel, plaintiff testified that inmate Jefferson later confirmed that he placed the grievance in the facility mailbox on their cell block. (Tr. 76-77). Plaintiff procured a contemporaneous declaration from inmate Jefferson regarding what he heard during the alleged assault of plaintiff, which corroborated that Jefferson occupied the cell next to plaintiff in December 2012. (Tr. at 77).[4] During his recent deposition, inmate Jefferson stated that he had no specific

---

[3] Plaintiff, while on keeplock status, was entitled to be released from his cell for one hour per day for recreation, during which time he would have had access to the facility mailbox. However, he testified that he did not request to be released for recreation while on keeplock status. (Tr. at 72-73, 76). Plaintiff would have been allowed to shower while on keeplock status, but a defense witness, Sgt. LaValley, testified that plaintiff may not have had an opportunity to place mail in the facility mailbox while being escorted to or from his keeplock cell for the purpose of showering. (Tr. at 160, 165-66).

[4] A discussed below, inmate Jefferson's declaration did not mention any involvement in mailing plaintiff's first grievance. (Tr. 77).

recollection of placing something in the facility mailbox for plaintiff in December 2014, when he was confined in the cell next to plaintiff. However, inmate Jefferson testified that, if plaintiff had asked him to mail something while plaintiff was confined on keeplock, Jefferson would have done so.[5]

A hearing officer dismissed the misbehavior report against plaintiff on or about December 9, 2014, and he was taken off "keeplock" status. (Tr. 72-73, 83). Plaintiff thereafter had regular access to the facility mailbox. (Tr. at 83-84). The hearing officer reported plaintiff's allegation, during the disciplinary hearing, of an assault by defendant Nolan.[6] (Tr. at 97). Lt. Brooks interviewed plaintiff and Officer Nolan about the alleged incident on December 15, 2014. (Tr. at 97-98; Pl.'s Exs. A-C).[7]

Because plaintiff did not receive the expected written confirmation that his grievance had been filed with the IGP Supervisor (Tr. at 25), he made a request to DOCCS under the Freedom of Information Law ("FOIL"), on or about December 15, 2014 to determine whether his grievance had been received and filed. (Tr. at 27-29). Plaintiff received a response from the facility FOIL unit, on or about December 26th, that the facility did not have a record of his December 4th grievance. (Def.'s Ex. 12; Tr.

---

[5] Pending completion of the deposition transcript, plaintiff's counsel summarized inmate Jefferson's testimony on this point in his recent letter brief. (Dkt. No. 95). Defense counsel belatedly filed a supplemental submission, which stressed Jefferson's lack of recollection, but did not contradict plaintiff's counsel's summary of the deposition testimony. (Dkt. No. 96; 8/10/2018 Text Minute Entry).

[6] As a result, plaintiff was seen by a DOCCS nurse on December 11th, who reported that plaintiff had a swollen right ankle. (Def.'s Ex. 25 (Am. Compl.), Dkt. No. 19 at 9 & Ex. S-1 to Am. Compl., Dkt. No. 19-22 at 55).

[7] The court incorrectly referred to Exhibits A through C as defense exhibits during the hearing, but they were plaintiff's exhibits.

at 29-32).[8]

Plaintiff alleges that on December 30, 2014, he "resubmitted" a copy of his grievance, again retaining a copy. (Def.'s Ex. 13; Tr. at 32, 35). Plaintiff testified that he personally placed this grievance in the facility mailbox on his cell block in an envelope addressed to the grievance unit, with his name on it. (Tr. at 35-36). The "resubmitted" grievance contained a cover-letter, addressed to the IGRC, stating that plaintiff had been informed, through his FOIL request, that the IGRC never received his December 4th grievance, and advising that plaintiff was "re-submitting [his] initial grievance regarding retaliatory treatment/assault" by defendant Nolan. (Def.'s Ex. 13). Because plaintiff's re-submitted grievance was allegedly mailed more that 21 days after the alleged assault, it was untimely under DOCCS rules; however, it was mailed within the 45-day period during which an inmate could be granted an extension of the filing deadline. (Tr. at 3, 138-39; Def.'s Ex. 20, DOCCS Directive # 4040, §§ 701.5(a)(1), 701.6(g)).

After again not receiving the expected written confirmation of his December 30th grievance, plaintiff made another FOIL request to determine whether it had been received by the Inmate Grievance Supervisor.[9] (Tr. at 38-39). Plaintiff was advised on

---

[8] There are three dates on the DOCCS FOIL form. It appears plaintiff filed his FOIL request on December 15th, was advised on December 23rd that his request was being reviewed, and notified on December 26th that no record of his grievance existed. (Def.'s Ex. 12; Tr. at 33-34).

[9] It is not clear from the DOCCS response when in January plaintiff filed this FOIL request. As discussed further below, plaintiff's original complaint in this action, dated January 7, 2015, was filed with the court on January 14th. (Def.'s Ex. 14).

January 22, 2015, that his request was being reviewed and, on January 23rd, that the inmate grievance unit had no record of his December 30th grievance. (Def.'s Ex. 15).

On January 23rd, plaintiff wrote a letter to the facility superintendent complaining about the alleged assault by defendant Nolan on December 4th, and the fact that plaintiff had submitted two grievances that were never filed by the inmate grievance unit. (Tr. at 39, 41; Def.'s Ex. 16). Defendant received a response on January 28th, advising him that his complaint had been referred to the Deputy Superintendent for Security for review and appropriate action. (Tr. at 42; Def.'s Ex. 16). Plaintiff testified that he never received any further communications from facility staff with respect to this complaint. (Tr. at 42). Plaintiff also wrote a similar complaint to the New York Attorney General's Office in March 2015, although he placed the name of another inmate on the envelope to ensure that it was mailed from the facility. (Tr. at 49-51; Def.'s Ex. 17).

### C.    The Defense Version of Disputed Facts

Defense counsel extensively cross-examined plaintiff during the exhaustion hearing, and called three witnesses–CORC Assistant Director Rachel Sequin; Clinton's IGP Supervisor, Christine Gregory; and Clinton Sgt. Chad LaValley. Defendant Nolan was not called to testify by either side. (Tr. at 205).

Defense counsel contended that the credible evidence does not support plaintiff's claim that he attempted to submit grievances with respect to the December 4, 2014 incident with defendant Nolan. (Tr. at 195-98). Counsel also suggested, for the first time during the exhaustion hearing, that plaintiff's action should be dismissed because

he filed his initial complaint prematurely, while he was still attempting to pursue the grievance process with respect to the incident. (Tr. at 100-03, 192-94, 202).

During the hearing, plaintiff acknowledged that he was aware of the DOCCS grievance procedures and knew that if he did not complete all of the steps of the grievance process with respect to a complaint, he might not be able to pursue a lawsuit. (Tr. at 26-27, 51-52, 84). Plaintiff eventually confirmed that he felt that the grievance process at Clinton was "a joke," and that he failed to fully exhaust some other prior grievances when the alleged staff misconduct did not directly threaten his well-being. (Tr. at 55-57, 58).

During cross-examination of plaintiff, defense counsel established that, before, during, and after December 2014, various internal communications and other grievances that plaintiff placed in the facility mailbox with his name on the envelope were received by the facility officials to whom they were directed. (*See, e.g.*, Tr. at 61-64, 65-67, 68-72 86-87, 90-93; Def.'s Exs. 1-3, 7, 8, 10, 12, 15, 16). Plaintiff also acknowledged that an April, 2015 grievance against defendant Nolan for alleged harassment was received by the grievance unit and address by the facility superintendent and CORC. (Tr. at 93-94; Def.'s Exs. 19, 21).

Defense counsel documented, during cross-examination, that neither plaintiff, nor inmate Jefferson had alleged, in various documents, that Jefferson placed plaintiff's December 4, 2014 grievance in the facility mailbox, until plaintiff made that assertion during his deposition. (Tr. at 77, 79-80, 81-83). Plaintiff admitted that he did not see inmate Jefferson place the December 4th grievance in the facility mailbox, nor had he

15

seen anyone tampering with his two grievances, or his mail generally.  (Tr. at 76-77, 94).

Plaintiff was questioned by defense counsel as to why he did not do more to follow up with the IGP Supervisor who had apparently not received the two December 2014 grievances, of which plaintiff had kept carbon copies.  (Tr. at 85-86, 87-90, 99-100).  Plaintiff testified that he made two attempts to submit his grievance to the IGP and never obtained any confirmation that his grievances had been received and filed. Viewing further efforts to communicate with the IGP as futile, and not knowing how to proceed otherwise, he complained to the facility superintendent.[10]  (Tr. at 42, 85-86, 87-90, 99-100).

IGP Supervisor Christine Gregory testified that she never threw away any inmate grievance received by her unit at Clinton.  (Tr. at 132, 134).  She stated that the IGP typically provided an inmate with written confirmation that a grievance alleging staff misconduct had been received and filed, with an assigned grievance number.  (Tr. at 146-47).  Ms. Gregory did not recall being aware of plaintiff's two FOIL requests looking for confirmation that his December 2014 grievances had been received by the IGP, but her unit would have been asked by the FOIL clerk at Clinton to determine whether they had those documents.  (Tr. at 149-51).  She admitted that her unit would

---

[10] Plaintiff also stated that he did not attempt to communicate directly with CORC about the fact that his grievances had not been filed, because prior efforts to communicate with CORC about other grievance issues resulted in direction to raise his issues at the facility level first.  (Tr. at 42).  Rachel Sequin, the CORC Assistant Director, confirmed that an inmate who made an inquiry or complaint to CORC that was not made in the context of an appeal of a grievance **filed** at the facility, would be directed to first raise the issue with staff at the facility.  (Tr. at 118).

not have followed up on a FOIL request which revealed that the IGP did not have any record of a grievance that an inmate claimed to have filed. (Tr. at 144-45, 150). Ms. Gregory stated that the security staff at the facility, not the IGP, would have been responsible for investigating complaints that grievances placed in facility mailboxes were not being received. (Tr. at 144-45). She stated that grievances about staff assaults were referred directly to the facility superintendent for investigation and action, and that the IGP would typically not address inmate questions regarding such a grievance. (Tr. at 133, 142).

Sgt. LaValley testified about procedures at the Clinton facility, including those relating to inmate mail. He stated that there was a secure facility mailbox in each cell block at Clinton into which inmates could deposit internal or external mail as they left the cell block, *e.g.*, on the way to "chow" (meals). (Tr. at 155-57). The mailbox was in the lobby of plaintiff's cell block in 2014, and could not be viewed by any inmate when he was in his cell. (Tr. at 157, 172-73). While technically not allowed, an inmate could ask another inmate to place a piece of mail in the facility mailbox. (Tr. at 160-61). If an inmate was on keeplock status, he could, in theory, have access to the facility mailbox during the one hour he could be released from his cell for recreation or showers, but would likely be frisked by officers as he was leaving the cell. The correction officer would likely inspect any mail the keeplocked inmate was trying to put in the box, and decide whether or not the inmate could mail it. (Tr. at 160).

Mail was picked up from each cell block every week day by the Visiting Room Officer (or his relief officer if he was not at work) while in the company of an inmate

member of the Inmate Liaison Committee ("ILC"). (Tr. at 157-59, 161-63). This process, with an inmate monitoring the mail collection, was implemented more than ten years before because of inmate complaints about their mail going missing. (Tr. at 162, 164-65, 171). Mail was usually picked up when most of the inmates were getting chow and were not present on the cell block. (Tr. at 161-62, 172-73). There were only two rings of keys that would open the mailboxes and the officer collecting mail had to log the key in and out of the room where the keys were stored. (Tr. at 157-58). After the mail was collected from each cell block, the Visiting Room Officer and ILC inmate would deliver the mail to the correspondence room, which Sgt. LaValley believed was staffed by DOCCS civilian employees. (Tr. at 163-64). The Visiting Room Officer and ILC inmate did not observe the mail being sorted or delivered. (Tr. at 179-80).

Sgt. LaValley acknowledged that inmate complaints that grievances at Clinton had not been delivered to the IGP were common, and have been repeatedly raised during periodic meetings between the ILC and facility management. (*See* Pl.'s Ex. D at p. 2; Tr. at 170-71). Sgt. LaValley estimated that, on a typical day, several hundred pieces of mail are picked up at Clinton, including 40 to 50 grievances. (Tr. at 183).

Plaintiff acknowledged that he dated his original federal complaint January 7, 2015. (Tr. at 101). As of that time, plaintiff had not received a response to his second FOIL request about his "re-submitted" December 30, 2014 grievance, and had not yet written his letter of complaint to the facility superintendent. (Tr. at 100-103).

## III.  **Findings and Conclusions**

The court viewed plaintiff's testimony during the hearing, and has reviewed the corroborating and contrary evidence submitted.  The court finds that the plaintiff credibly met his burden of production, documenting that he twice attempted to file a grievance with respect to the alleged assault by defendant, pursuant to the mail and grievance procedures in place at Clinton.  While defense counsel pointed out some minor inconsistencies between plaintiff's hearing testimony, his June 2016 deposition testimony, and various pleadings filed between early 2015 and late 2016, plaintiff's version of events has been substantially consistent.  Given the passage of time since the relevant events of late 2014 and early 2015 and the significant volume of relevant documents, some factual inconsistencies would be expected.

During his recent deposition, inmate Jefferson had no specific recollection of depositing plaintiff's first grievance into the facility mailbox on December 5, 2014–almost four years earlier.  However, plaintiff testified, in response to cross-examination by defense counsel, that inmate Jefferson told plaintiff, after the fact, that he had actually placed the grievance in the mail box.  Moreover, plaintiff's subsequent steps–submitting a FOIL request to try to confirm that the IGP had received his grievance, and then re-submitting the grievance–provides strong corroboration of plaintiff's testimony.  If plaintiff had not submitted the original grievance the day after the incident, he could have just filed a grievance on or about December 15th, when he filed the FOIL request, because the grievance would have still been timely, in that it would have been submitted less than 21 days after the incident . (*See* Def.'s Exhibit 20,

DOCCS Directive # 4040, § 701.5(a)(1); Tr. at 119).[11]

The defense countered plaintiff's claims that his two attempts to submit grievances about the alleged assault were thwarted by pointing out that plaintiff had successfully filed grievances before and after December 2014. However, plaintiff pointed to documentation of an earlier example when a grievance he submitted was apparently not delivered to the IGP.[12] (*See* Def.'s Exs. 5-7; Tr. at 37-38, 64-67, 68). And, as plaintiff's counsel pointed out (Tr. at 188), plaintiff's first grievance apparently was diverted the morning after plaintiff told defendant Nolan he would report his conduct. Defendant Nolan allegedly told plaintiff, in substance, that grieving his conduct would not get plaintiff anywhere. On December 15, defendant Nolan received notice that plaintiff was still complaining about the alleged assault, because Officer Nolan was interviewed by Lt. Brooks about the incident, based on plaintiff's prior complaints at his disciplinary hearing. Plaintiff's testimony indicates that defendant Nolan had notice of the likelihood that plaintiff would attempt to file grievances with respect to the alleged assault.

Plaintiff was able to file a subsequent grievance complaining about defendant

---

[11] Plaintiff's omission, in early pleadings, of inmate Jefferson's role in mailing the December 4, 2015 grievance could reflect plaintiff's reluctance to implicate his neighbor in arguably circumventing the keeplock restrictions on plaintiff. But, for the reasons stated above, the court finds that plaintiff's arguably belated disclosure of inmate Jefferson's role does not undermine the credibility of plaintiff's explanation as to how the first grievance was submitted.

[12] The plaintiff identified a copy of an initial, unrelated grievance that he submitted, but that was not received by the IGP. (Def.'s Ex. 5). Plaintiff successfully resubmitted that grievance, after being advised, in response to an inquiry to the IGP Supervisor, that the IGP did not have the first grievance. (Def.'s Exs. 6-7).

Nolan's alleged verbal harassment in April of 2015. However, the court notes that this grievance was filed after plaintiff complained to the facility superintendent and the Attorney General's Office about the disappearance of his December 2014 grievances. It seems probable that the investigation of plaintiff's complaint to the superintendent would deter any further efforts to divert his grievances.

Defense counsel suggested that the procedure for gathering mail at Clinton prevented any tampering or diversion of grievances by staff, and that plaintiff offered no specific evidence as to how his grievance could have been diverted. However, there is no way plaintiff could know how his grievances disappeared, because inmates at Clinton were not in a position to monitor what happened during mail pick-up, sorting, or delivery. As Sgt. LaValley stated, there have been continuing complaints at ILC meetings about grievances not being delivered to the IGP, and one of the inmates on the ILC was supposedly the monitor who ensured that the corrections staff did not divert mail when it was being picked up from the facility mailboxes.[13] While IGP Supervisor Gregory specifically denied ever tampering with an inmate grievance, the defense offered no such representations from defendant Nolan, or from the Visiting Room Officer(s) or the ILC representative(s) who collected the mail, the custodian(s) of the

---

[13] Sgt. LaValley also testified that grievances were perceived by DOCCS officials as an important outlet for inmates, and suggested that there was no motivation for DOCCS employees to attempt to interfere with inmate access to grievances. (Tr. at 183). However, officials at Clinton demonstrated little interest in following up on plaintiff's FOIL requests or complaints that his grievances had gone missing. Ms. Gregory testified that the IGP would not have taken any further action with respect to plaintiff's two FOIL requests, which indicated that he attempted to file two grievances that were never received. And, plaintiff testified that there was no apparent follow-up by the Deputy Superintendent for Security, to whom the Superintendent delegated the responsibility to investigate plaintiff's January 23, 2015 complaint.

mailbox keys, or the correspondence room staff who sorted and delivered the internal mail at Clinton.[14] Sgt. LaValley acknowledged that most of the correction officers and civilian staff working at Clinton live in the surrounding area. (Tr. 180). Plaintiff's counsel plausibly suggested that the corrections and civilian staff at Clinton may have loyalties to each other that could result in tampering with respect to the internal mail at Clinton. (Tr. at 22-23, 163-64, 179-80, 190-91).

As noted earlier, plaintiff credibly met his burden of production by documenting two efforts to file grievances with respect to the alleged assault, pursuant to the appropriate DOCCS and facility-specific procedures. The defense bears the ultimate burden of establishing the failure to exhaust by a preponderance of the evidence, and the general evidence about mail and grievance procedures at Clinton were not sufficient to overcome plaintiff's evidence, notwithstanding his lack of knowledge as to how his grievances might have been diverted. *See, e.g.*, *Nelson v. Plumley*, 2015 WL 4326762, at *8-9. In *Nelson v. Plumley*, Magistrate Judge Peebles found, in similar circumstances, that civil right defendants asserting the affirmative defense of failure to exhaust, did not sustain their burden of proof, once plaintiff met his burden of production that he unsuccessfully attempted to file a grievance:

---

[14] The court recognizes the burden of eliciting such proof from witnesses, other than defendant Nolan, many years after the events at issue. The court also acknowledges that few such witnesses would have current recollections of relevant events. However, when a plaintiff credibly meets his burden of production with respect to the unavailability of the grievance process in the particular circumstances he faced, the defendants may not be able to meet their ultimate burden of proof with respect to the affirmative defense of failure to exhaust with general evidence about what procedures were on the books with respect to grievances and mail. *See, e.g., Nelson v. Plumley*, 2015 WL 4326762, at *8-9.

Here, plaintiff credibly testified that on January 12, 2012, he attempted to mail the January grievances concerning defendants' alleged assault by having a corrections officer pick them up while he was confined in the SHU at Clinton. . . . While Clinton IGP Supervisor Gregory testified that she never received those grievances, there is no record evidence that explains or suggests why they were not processed or what happened to them after they were retrieved by the unidentified DOCCS corrections officer. . . . Defendants have offered no reason why plaintiff would fabricate the grievances post hoc, nor do they provide any reason for why plaintiff would be reluctant to prepare and forward a grievance for processing. At the time he claims to have mailed the grievances, plaintiff sent several letters to various DOCCS officials complaining of the assault, demonstrating that he did not fear retribution for complaining concerning the incident. . . . Moreover, by his own admission, plaintiff is no stranger to the grievance process and does not appear to have hesitated in lodging complaints concerning this and other matters, both utilizing the IGP and through other avenues. . . .

*Id*. at 8 (citations to record omitted).[15]

Defense counsel repeated an argument made in support of defendant's summary judgment motion, that plaintiff made only a "general claim that his grievance was lost or destroyed[, which] does not excuse the exhaustion requirement." (Def.'s' Mem. of Law at 10-11, Dkt. No. 50-2) (citing, *inter alia*, *Rosado v. Fessetto*, No. 9:09-CV-67 (DNH/ATB), 2010 WL 3808813, at *7, 2010 U.S. Dist. LEXIS 108238, at *19 (N.D.N.Y. Aug. 4, 2010) (Rep't-Rec.), *adopted*, 2010 WL 3809991, 2010 U.S. Dist.

---

[15] Plaintiff in *Nelson v. Plumley* was confined in the SHU, which meant he could only submit a grievance by handing it to a correction officer. As noted above, the plaintiff in this case was on keeplock status, and was able to give his grievance to an inmate in the neighboring cell to place in the facility mail box. *Nelson v. Plumley* is arguably distinguishable from this case because Nelson's SHU confinement created a more obvious mechanism for correction officers to prevent the filing of a grievance. However, given that plaintiff in this case documented that he made two unsuccessful efforts to file a grievance through the facility mail box (whereas Nelson only made one attempt from his SHU cell), this court still finds *Nelson v. Plumley* instructive authority supporting my finding that defendant did not meet his burden of proof in this case.

LEXIS 99073 (N.D.N.Y. Sept. 20, 2010)). As noted in my opinion recommending denial of the summary judgment motion (at 10-11, Dkt. No. 53), *Rosado* correctly stated the law, at the time it was decided. However, *Ross* has changed the law with respect to exhaustion, and requires a court to focus on whether the administrative remedies were "available" to the inmate. 136 S. Ct. at 1859-60. In any event, plaintiff did not make a "general claim" that his grievance was lost or destroyed. He submitted a great deal of documentary evidence to corroborate his testimony that he was prevented from filing a grievance, despite reasonable, good faith efforts to do so.[16]

This court has found that plaintiff credibly testified that, despite two attempts, plaintiff's grievances with respect to defendant Nolan's alleged assault were never filed with the IGP. Based on that finding, the Second Circuit's *Williams* case, discussed above, establishes that the grievance process was "unavailable" to plaintiff under the Supreme Court's standards in *Ross*. *See Medina v. Napoli*, 2018 WL 1081211, at *1 (noting, in the context of a defense summary judgment motion based on plaintiff's alleged failure to exhaust: "The *Williams* decision makes clear that the prison grievance regulations 'plainly do not describe a mechanism for appealing a grievance

---

[16] In *Moreau v. Peterson*, 672 F. App'x 119 (2d Cir. 2017), the Second Circuit affirmed a dismissal of civil rights claims for failure to exhaust, even though the plaintiff claimed that he was prevented from doing so, because his argument was "inconsistent with the fact that he filed grievances for other claims in the same time period, and those grievances were processed fully." *Id.* at 3 n.1. A review of the District Court's opinion in *Moreau* shows that plaintiff provided "no evidence" of filing grievances related to the claims in question, all of which occurred after the last grievance that was attached to the complaint. *Moreau v. Peterson*, No. 7:14-CV-201, 2015 WL 4272024, at *7 (S.D.N.Y. July 13, 2015). As discussed in my prior Report-Recommendation (at 11-12), this case is distinguishable from *Moreau* because of the corroborating documentation submitted by plaintiff.

24

that was never filed' by reason of inaction or obstruction by prison officials, resulting in a situation where 'the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it.'")[17]

The case law in this Circuit is relatively clear that *Williams* should be applied only when an inmate's grievance is never filed, as opposed to when a grievance is filed, but not responded to on a timely basis by prison officials.  *See, e.g., Cicio v. Wenderlich*, No. 13-CV-195S, 2017 WL 1437206, at *5-6 (W.D.N.Y. Apr. 24, 2017) (granting summary judgment against plaintiff for failure to exhaust when he failed to appeal a grievance **for which he received a receipt confirming that it was filed**, but for which he never received a response on the merits of his grievance), *aff'd*, 714 F. App'x 96, 97 (2d Cir. 2018) (affirming grant of summary judgment, and distinguishing *Williams* which found the DOCCS grievance process "unavailable" when an inmate's grievance was never filed).  However, some district court cases also suggest that *Williams* should be limited to its particular facts, *e.g.*, by not applying its holding to plaintiffs who are not confined in a SHU, and who do not need to rely on correction officers to submit their grievances.[18]  *See, e.g., Shaw v. Ortiz*, No. 15-CV-8964, 2016 WL 7410722, at *6 (S.D.N.Y. Dec. 21, 2016) ("the factual scenario here is different

---

[17] Magistrate Judge Peebles, in *Nelson v. Plumley*, anticipated the Second Circuit's decision in *Williams*.  2015 WL 4326762, at *9 ("In the absence of any evidence that would explain what happened to plaintiffs January grievances, and in light of plaintiff's credible testimony, I find that the IGP was effectively rendered unavailable to plaintiff when his grievances were lost after a corrections officer picked them up from his SHU cell.").

[18] In *Medina v. Napoli*, 725 F. App'x at 53-54, the Second Circuit followed *Williams* in a case involving a SHU inmate, but absent the additional circumstance of a transfer to a different facility, which might have further complicated the inmate's ability to file a grievance.

25

from that in *Williams* where the Second Circuit found that part of the IGP's regulatory scheme was 'so opaque and so confusing that . . . no reasonable prisoner c[ould] use' it.) (citing, *Mena v. City of New York*, No. 13-CV-2430, 2016 WL 3948100, at *5 (S.D.N.Y. July 19, 2016) (finding that the Second Circuit's decision in Williams "hinged on the 'extraordinary circumstances' specific to the case before it")); *Rodriguez v. Cross*, No. 15-CV-1079 (GTS/CFH), 2017 WL 2791063, at *7 (N.D.N.Y. May 9, 2017) ("Courts have denied a defendant's motion for summary judgment when faced with an unanswered and unfiled grievance drafted in SHU. . . . This is distinguishable from plaintiff's alleged July 19, 2014 grievance drafted in keeplock.")[19] (Rep't-Rec.), *adopted*, 2017 WL 2790530 (N.D.N.Y. June 27, 2017).[20]

---

[19] As noted above, Sgt. LaValley testified that, while an inmate on keeplock status at Clinton would have limited access to the facility mailbox, officers would likely "frisk" the inmate and could decide whether or not to allow the plaintiff to place an item in the facility mailbox. (Tr. at 160). Thus, at least in the Clinton facility, officer control over an keeplocked inmate's ability to mail a grievance is not dramatically different than for a SHU inmate.

[20] Defendants' post-hearing submission cites other cases that would limit *Williams* to its particular facts. (Dkt. No. 87, at 3-6). Many of those cases are inapposite to this case because, unlike plaintiff Coleman, the inmate plaintiffs in the cited cases had offered no documentary corroboration of prior efforts to file a grievance, or admitted that they never actually submitted an initial grievance. *See, e.g.*, *Engles v. Dougherty*, No. 9:14-CV-1185 (TJM/ATB), 2017 WL 6466309, at *5 (N.D.N.Y. Aug. 22, 2017) (Rep't-Rec.), *adopted sub nom. Engles v. Souza*,, 2017 WL 6463074 (N.D.N.Y. Dec. 18, 2017); *Johnson v. Fraizer*, No. 16-CV-6096, 2016 WL 7012961, at *4 n.5 (W.D.N.Y. Dec. 1, 2016); *White v. Velie*, 709 F. App'x 35, 36-38 (2d Cir. 2017); *Scott v. Kastner-Smith*, 298 F. Supp. 3d 545, 554-55 (W.D.N.Y. 2018); *Pridgen v. Beatie*, No. 9:16-CV-535 (DNH/CFH), 2018 WL 1402049, at *7-8 (N.D.N.Y. Jan. 17, 2018) (Rep't-Rec.), *adopted*, 2018 WL 1394146 (N.D.N.Y. Mar. 19, 2018). Other cases cited by defense counsel do not support the application of *Williams* to this case because the plaintiffs in those cases actually filed initial grievances and defaulted on subsequent steps in the exhaustion process. *See, e.g.*, *Rawls v. Rosenfield*, No. 9:16-CV-582 (LEK/CFH), 2017 WL 7050648, at *7-9 (N.D.N.Y. Nov. 28, 2017), (Rep't-Rec.), *adopted*, 2018 WL 542249 (N.D.N.Y. Jan. 23, 2018); *Anderson v. Pedalty*, No. 14-CV-192, 2016 WL 8116154, at *5 (W.D.N.Y. Dec. 6, 2016) (Rep't-Rec.), *adopted*, 2017 WL 387085 (W.D.N.Y. Jan. 27, 2017).

As discussed above, the fact that an inmate was in SHU, where an inmate depends on correction officers to forward a grievance, may suggest the most likely explanation for how a grievance could have been diverted. However, this court concludes, despite some district court opinions suggesting otherwise, that the reasoning of *Williams*, which found that DOCCS procedures provided no clear guidance on how any inmate should proceed if a grievance is never filed, would apply even when the inmate is not confined in SHU. *See Berman v. Durkin*, No. 9:13-CV-136 (LEK/DJS), 2017 WL 1215814, at *7-8 (N.D.N.Y. Mar. 10, 2017) (applying *Williams*, in denying a defense summary judgment motion alleging failure to exhaust by an Clinton inmate, apparently housed in general population, who alleged that his grievance was not filed or answered) (Rep't-Rec.), *adopted*, 2017 WL 1207834 (N.D.N.Y. Mar. 31, 2017).[21]

As noted earlier, defense counsel argued, for the first time at the close of the exhaustion hearing, that plaintiff's action should be dismissed because he filed his original complaint (dated January 7, 2015) on January 14, 2015, before he completed his efforts to pursue a grievance with respect to the alleged assault. *See, e.g., Casey v. Brockley*, No. 9:13-CV-1271, 2015 WL 8008728, at *5 (N.D.N.Y. Nov. 9, 2015) (if the entire grievance appeal process is not completed prior to filing a complaint, it must be dismissed without prejudice) (citing *Neal v. Goord*, 267 F.3d at 122). However, by the time plaintiff filed his initial federal complaint, he had attempted to file his first

_____

[21] The defendants in *Berman* ultimately withdrew their affirmative defense of failure to exhaust prior to an exhaustion hearing. See N.D.N.Y. Civil Action No. 9:13-CV-136, Dkt. No. 208).

grievance (on December 5, 2014) and to re-submit his grievance (on December 30th), and had not received the customary acknowledgment that either had been received by the inmate grievance unit. By the time the complaint was filed, it was established, under *Williams*, that the grievance process was not available to plaintiff. Thereafter, the plaintiff took other steps with respect to his complaint about the alleged assault–the filing of another FOIL request and letters of complaint to the Superintendent and the New York Attorney General. However, such steps were not part of the official grievance process established by DOCCS. *See, e.g.*, *Berman v. Durkin*, 2017 WL 1215814, at *7 ("'the law is well-settled that informal means of communicating and pursuing a grievance, even with senior prison officials, are not sufficient under the PLRA.'") (*quoting Timmons v. Schriro*, 2015 WL 3901637, at *3 (S.D.N.Y. June 23, 2015)).[22] Under these circumstances, *Neal v. Goord* and its progeny would not require the complaint to be dismissed as prematurely filed.[23]

---

[22] A letter to the facility Superintendent would not have been the appropriate mechanism for plaintiff to appeal his grievance, which fell under the rules for harassment grievances, which are supposed to be addressed by the Superintendent in the first instance.

[23] It might have been clearer that this action was not prematurely filed if plaintiff had waited at least 45 days after the alleged assault to submit his complaint. By that time, according to Rachel Sequin, the CORC Assistant Director who testified at the hearing, plaintiff would have been foreclosed from filing a grievance or a requesting leave to file an untimely grievance. (*See* Tr. at 120-21; Defendant's Exhibit 20, DOCCS Directive # 4040, § 701.6(g)). However, given the holding in *Williams* that DOCCS procedures do not establish an intelligible mechanism for appealing a grievance that is not filed by the facility, plaintiff had no meaningful guidance as to how he should proceed once his two efforts to file his grievance were unsuccessful. In the absence of clear guidance in the DOCCS procedures that plaintiff might have been able to pursue other meaningful relief with respect to a grievance for up to 45 days after the alleged assault, his complaint should not be dismissed for filing the complaint when he did.

The court also notes that the defense counsel's delay in arguing that plaintiff's action should be dismissed as prematurely filed might well provide an independent basis for rejecting that argument. Defense counsel filed a summary judgment motion based on plaintiff's alleged failure to exhaust in September 2016 (Dkt. No. 50), which was denied in June 2017 (Dkt. No. 57). Defense counsel did not argue that this action was prematurely filed in connection with the summary judgment motion, but waited to make that argument at the exhaustion hearing in June 2018. By that time, the three-year statute of limitations would likely have run on plaintiff's claim regarding the incident in December 2014. Defense counsel's delay in arguing that plaintiff's complaint should be dismissed because it was filed prematurely, while perhaps not motivated by an intentional effort to prevent plaintiff from re-filing his action, may well have that effect. While not necessary to support this court's rejection of the argument that this action was prematurely filed, defense counsel's delay in raising the issue further supports precluding the defendant's reliance on this argument.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that because the exhaustion remedies under the DOCCS Inmate Grievance Program were rendered unavailable to plaintiff with regard to grievances complaining of an alleged assault by defendant Nolan on December 4, 2014, his remaining claim in this action is not barred by the Prison Litigation Reform Act based upon a failure to exhaust administrative remedies. And it is further

**ORDERED**, that this matter be set down for trial on plaintiff's remaining claim

of excessive force against defendant Nolan.


Dated:  October 2, 2018


_____
**Hon. Andrew T. Baxter**
**U.S. Magistrate Judge**